UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 1:15-cr-00002-TLS-SLC |
| | ) | |
| LARRY J. NORTON | ) | |

**REPORT AND RECOMMENDATION**

Before the Court is a motion to suppress (DE 75) filed by Defendant Larry J. Norton. Norton seeks to suppress the large amount of United States currency discovered by police in the truck he was driving on November 7, 2014. Norton contends that he was stopped by police without probable cause to believe that a traffic violation had occurred and further contends that the traffic stop was mere pretext for a drug search.[1]

The motion to suppress has been referred to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b). (DE 86). Based on the following facts and principles of law, and after considering the evidence and argument, I RECOMMEND that Norton's motion to suppress be DENIED.

*A. Background*

On January 28, 2015, Norton was indicted for a violation of 21 U.S.C. § 846 for conspiring with Allan L. Bates ("Bates"), James W. Lepper ("Lepper"), Eric D. White ("White"), and Ryan Bowman to distribute and possess with the intent to distribute heroin, cocaine, and marijuana. (DE 1). On March 13, 2015, Norton pleaded not guilty. (DE 45). On

---

[1] Norton also initially argued that the traffic stop was unreasonably prolonged and that his truck was seized without a warrant or proper justification (DE 75), but he does not mention these arguments in his post-hearing briefs (DE 125; DE 132). The Court assumes that Norton has abandoned these arguments given the evidence and testimony presented at the hearing.

June 24, 2015, Norton filed the present motion to suppress. (DE 75). The government filed a response in opposition to Norton's motion on July 2, 2015. (DE 85). The Court held an evidentiary hearing on this matter on October 29, 2015, which continued on December 1, 2015. (DE 104; DE 116).[2] On February 8, 2016, Norton filed a post-hearing brief in support of his motion to suppress (DE 125), and on March 10, 2016, the government filed its post-hearing brief in opposition (DE 131). Norton filed his reply to the government's post-hearing brief on March 28, 2016. (DE 132).

### B. Findings of Fact

At the evidentiary hearing, the government offered the testimony of Brad Shultz, a patrol officer with the Indiana State Police ("ISP") (Tr. 7-8); Jeffrey Robertson, a special agent with the Federal Bureau of Investigation ("FBI") (Tr. 88); Adalberto Martinez, a detective and task force officer with the ISP (Tr. 102-03); Gary Shenefield, a master trooper with the ISP (Tr. 162); and James Keszei, a special agent with the FBI (Tr. 185). The testimony of the government's witnesses was not meaningfully contested, except with respect to one point—whether the 55 mph signs in the construction zone were flashing at the time of the traffic stop. To contest this point, Norton offered the testimony of Terry Olding, a construction project manager/project engineer with the Indiana Department of Transportation ("IDOT"). (Tr. 237). Aside from that limited dispute, the Court finds each of the witnesses' testimony credible and finds as follows:

1. <u>The Bates Investigation</u>

In July 2014, the agents recruited an informant on the inner circle of a drug conspiracy

---

[2] The Court will refer to the transcript of the hearings (DE 121; DE 122) as "Tr. __." The October 29, 2015, hearing (DE 121) is transcribed in pages 1 through 128, and the December 1, 2015, hearing (DE 122) is transcribed in pages 129 through 257.

that was being led by Bates. (Tr. 104-05, 189-90). The informant told the agents that the Bates organization, which was connected to a Mexican drug cartel, was distributing hundreds of kilograms of cocaine and thousands of pounds of marijuana; in the fall of 2014, the informant stated that the conspiracy's newest venture was heroin distribution. (Tr. 104-05, 192). The informant stated that Norton was a money counter within the inner circle and was Bates's right-hand man in distributing cocaine to customers. (Tr. 109, 229). The informant identified Norton and White as trusted members of Bates's inner circle, and the informant discussed the conspiracy's use of hidden compartments within vehicles. (Tr. 191-93). The informant explained the conspiracy's preferred tactic of using two vehicles when transporting drug or money loads, and he mentioned some of the drug customers, including those located in Akron, Ohio, and Lima, Ohio. (Tr. 192, 206). The informant was able to provide the location of Bates's stash location and hideout in Ohio. (Tr. 191). The agents considered the informant to be credible and reliable because his information was extremely detailed and was consistently verified throughout the investigation via surveillance, pole camera footage, and recorded conversations. (Tr. 107-08, 189-91).

In September 2014, the informant met Bates at Bates's home in Mission, Texas, near the Mexican border. (Tr. 193-95). FBI surveillance in Texas corroborated the informant's trip and arrival and that Bates met the informant at the McAllen International Airport and took the informant to his residence. (Tr. 194-95). Bates and the informant returned to Indiana on October 1, 2014. (Tr. 198-99). Prior to their return, the informant overheard Bates negotiating drug deals over the telephone, including a cocaine deal with a customer in Akron and a big heroin deal. (Tr. 199). For the heroin deal, Bates directed White and Norton to pick up the

3

heroin load in Chicago and bring it back to Fort Wayne. (Tr. 199).

On October 2, 2014, the informant recorded a meeting he took part in with Bates, Norton, and others at Norton's residence on Warsaw Street in Fort Wayne. (Tr. 109, 136, 200-01). Officers verified the location as Norton's residence through his vehicle registration and driver's license. (Tr. 109). The focus of the meeting was the high quality of, and the distribution of, six kilograms of heroin located at Norton's residence at the time. (Tr. 110-12). The group talked about how to cut or dilute the heroin in order to maximize their profit margin. (Tr. 110-11, 114). Norton called someone over to his house to test the drug's quality. (Tr. 110-11). Bates and Norton discussed the profit margin, and Norton counseled the informant on drug pricing; Bates talked about his fronting strategy. (Tr. 115-16, 118-23). Norton also said that he had some decent marijuana on hand for sale. (Tr. 120). During the meeting, a customer from Lima arrived to obtain heroin; Bates, Norton, and the customer went into the kitchen to complete the transaction, with Bates later confirming that he had sold a kilogram for $80,000 and fronted the customer a second kilogram. (Tr. 123-25). After the customer left, the informant saw Norton in the kitchen counting cash with a money counter. (Tr. 125). After the meeting, Bates and the informant went to Bates's Ohio hideout, with pole camera footage confirming their arrival. (Tr. 126).

On November 5, 2014, the informant recorded another meeting with Bates and Norton. (Tr. 201, 207-08). Bates, Norton, White, and the informant met at Norton's residence, and Bates directed Norton and White to deliver cocaine to Akron. (Tr. 204-05). On several occasions, Norton reminded White to be at his house at 5:30 a.m. the next morning. (Tr. 205-06). The group talked about how to avoid police stops, and Norton and White were supposed to bring

4

money back. (Tr. 207). The conspiracy's rule of two vehicles was to be employed for the Akron trip, with White and Norton being the two to perform the cocaine delivery. (Tr. 209).

On the afternoon of November 6, 2014, the informant and Bates arrived at Norton's house on Warsaw Street, and White and Norton arrived shortly thereafter, with Norton carrying a large duffel bag of cash into the house. (Tr. 211-12). Norton was driving a blue pickup truck, and White was driving a maroon pickup truck. (Tr. 212-13). In the house, White, Norton, Bates, and the informant counted the cash and repackaged the money in a very specific way—sealing the cash in plastic, which was wrapped in duct tape with a number written on the outside to indicate the amount. (Tr. 213-15). The informant told the agents that the packaged money was heading "up north" the next morning, November 7, to an older white male who was north of Fort Wayne in the Angola or Hamilton area. (Tr. 214-15). Bates talked about the Akron customer getting a discounted price on 10 to 12 kilograms of cocaine, and the informant estimated the total amount of packaged cash to be $400,000. (Tr. 216).

2. The November 7, 2014, Traffic Stop

As a result of the information received from the informant as corroborated by surveillance, the agents decided to effect a "walled off" traffic stop of Norton on November 7, 2014. (Tr. 157-58, 229-30). A "walled off" stop is one in which police officers develop probable cause by watching the suspect's vehicle for any traffic violations, rather than relying on the long-term investigation into the conspiracy as probable cause to stop the vehicle. (Tr. 157-58, 229-30). The agents explained that this method protects the informant and the underlying long-term drug investigation. (Tr. 157-58, 229-30). Detective Martinez agreed that if they had wanted to stop the investigation, they could simply have effected a stop of Norton based on the

5

probable cause from the recordings; he emphasized, however, that their intent was to continue the covert investigation into the drug conspiracy group. (Tr. 158).

Officer Shultz was the uniformed officer asked to assist with the traffic stop and possible vehicle search of hidden compartments. (Tr. 16-17). Officer Shultz had been working on the Bates case with the agents "for a long time." (Tr. 16). Officer Shultz's job was to follow closely behind the undercover agents, who would tail Norton, and at the time they deemed, move up into a position to effect the traffic stop. (Tr. 17). The night before the planned stop, Officer Shultz contacted Officer Shenefield and asked for his assistance in making the stop. (Tr. 176).

On November 7, 2014, surveillance observed Norton's garage open at 5:22 a.m. and then observed two men move Norton's blue pickup truck and a maroon pickup truck. (Tr. 137-38, 158-59, 216-17). The driver of the blue truck, later identified as Norton, left shortly thereafter and went to a nearby gas station; surveillance verified the truck's license plate and confirmed that the truck was registered to Norton. (Tr. 139). Norton obtained gas and talked to a female in a black Chevrolet Impala; the informant had previously mentioned a woman in a black Impala as someone who worked for Norton in the drug conspiracy. (Tr. 139-40, 201). Surveillance then followed Norton north out of Fort Wayne onto northbound Interstate 69. (Tr. 140, 154, 157-58).

Special Agent Robertson was part of the surveillance team following Norton. (Tr. 91, 93). He used his vehicle's speedometer to determine Norton's speed by "pacing" him. (Tr. 94-95). Over the course of about 20 minutes on the highway, Special Agent Robertson observed Norton traveling from 70 to 75 mph. (Tr. 94-95). The decision to stop Norton was made when he entered a construction zone near mile marker 333. (Tr. 95). The construction zone was fairly long and marked with barrels with flashing markers, construction equipment, approximately 20

6

construction signs, and four 55 mph speed limit signs that said "55 when flashing"; both northbound lanes were open. (Tr. 19, 68, 95-96, 100). Due to the early morning hour, it was dark outside and no construction workers were observed. (Tr. 68). Officer Shultz testified that the 55 mph signs were flashing. (Tr. 19). Special Agents Robertson and Keszei testified that they saw flashing lights in the construction zone, but they could not say for sure whether the 55 mph signs were flashing or whether the flashing lights were on the barrels. (Tr. 95, 100-01, 223-24). Officer Shultz and Special Agents Robertson and Keszei all believed that the speed limit in the construction zone was 55 mph at the time. (Tr. 18-19).

Officer Shultz was in radio contact with the undercover agents following Norton. (Tr. 16-17, 231). Officer Shultz was asked to move into position after the agents "had a speeding violation on the vehicle at 72 in a 55 construction zone." (Tr. 18). Special Agent Robertson moved over for the marked police unit driven by Officer Shultz and verified that Officer Shultz was behind the right truck. (Tr. 96-97). Officer Shultz then used his radar and confirmed that Norton was traveling at 72 mph in a 55 mph construction zone at approximately 6:20 a.m. (Tr. 18-19, 21, 24, 79). The radar was hooked into the patrol car's speedometer, so Officer Shultz matched Norton's speed and confirmed the radar's results with his own speedometer, with Norton maintaining a speed of 72 mph for about three to four miles. (Tr. 19-20, 79). Officer Shultz confirmed the reliability and accuracy of his radar on a daily basis at the beginning and end of his shift. (Tr. 19-21).

Officer Shultz initiated a traffic stop, and Norton stopped the truck on the right shoulder of the highway, north of Auburn and just south of the Waterloo exit. (Tr. 19, 23). Officer Shultz asked the driver to produce his license and registration, confirming that the driver was Norton.

7

(Tr. 25-26). Officer Shultz observed that Norton was extremely nervous with trembling hands; he had sweat beads on his forehead despite it being cold outside. (Tr. 25-27, 168-69). Norton claimed to be going to Waterloo to go fishing, but he was oddly dressed in sweats and had no fishing gear. (Tr. 26, 168). Officer Shultz walked back to his patrol car and performed a records check, which revealed a previous suspension of Norton's commercial driver's license. (Tr. 27-28). Officer Shultz then called Officer Shenefield, who was parked on the shoulder one-half mile back, to come to the scene. (Tr. 27-28). Officer Shenefield appeared within a minute, and the two Officers walked back to Norton's truck; when approaching the vehicle this second time, Officer Shultz smelled burnt marijuana through the passenger window. (Tr. 27-30, 165). Norton was asked to exit the truck; when asked if there were any drugs in the truck, Norton said no and invited the Officers to search the truck. (Tr. 30-33, 74, 166-70).

Officer Shultz saw two air fresheners hanging from the mirror and at least six more in the center console. (Tr. 33). On the driver's side, the carpet had been pulled back to reveal an after-market wire or hydraulic line, indicative of a hidden compartment. (Tr. 33-36). Where the rear seat headrest met the back window, Officer Shultz found a .45 caliber shell casing, consistent with a gun being fired in the truck. (Tr. 36-38). Officer Shultz had his K9 perform a drug sniff on the exterior of the truck, and the canine immediately alerted at the back corner of the driver's side and sat as his final response as he moved across the tailgate. (Tr. 40-41). The K9 also alerted to drug odor at the passenger front door and the center console of the truck. (Tr. 41-42). Officer Shultz observed wear patterns on the taillight screws consistent with them being removed several times, which is indicative of a hidden compartment. (Tr. 43-45).

For safety reasons, Officer Shultz asked Norton if he would be willing to move the truck

8

to a nearby gas station, and Norton agreed. (Tr. 45, 171). Once at the gas station, Officer Shultz learned that Norton had more than two convictions for dealing narcotics. (Tr. 46). While a search warrant for the truck was pending, Norton requested and was permitted to leave at around 8:00 a.m., and a man in a white work truck picked him up. (Tr. 47-48, 65). Special Agent Keszei caught up with the white work truck and at about 8:01 a.m., was able to identify the driver as Lepper, an older white male who resided north of Fort Wayne in Butler, Indiana. (Tr. 217-19). Lepper and Norton went directly to see Bates at a workout facility in Fort Wayne. (Tr. 219-20). Bates came outside and talked to Norton in a rather animated fashion. (Tr. 220). Norton then left in the black Impala. (Tr. 220).

After obtaining a search warrant for Norton's truck (Tr. 51-53), the officers found duct-taped packages concealed within compartments in the voids behind the taillights, with a bottom plate welded on both sides to form the compartments (Tr. 55, 68-61). The money was found in the condition described by the informant. (Tr. 221). The total amount of money in Norton's truck was $400,200. (Tr. 222).

### 3. The Contested Testimony Concerning the Speed Limit

As stated earlier, the testimony of the government's witnesses was contested in just one meaningful way at the hearing. Officer Shultz testified that when he executed the traffic stop, he saw 55 mph signs flashing, denoting a speed limit of 55 mph in the construction zone. (Tr. 18-19, 68). Special Agents Robertson and Keszei testified that they saw flashing lights in the construction zone, but they could not say for sure whether the 55 mph signs were flashing or whether the flashing lights were on the barrels. (Tr. 95, 100-01, 223-24). Officer Shultz and Special Agents Robertson and Keszei all believed that the speed limit was 55 mph in the

9

construction zone. (Tr. 18-19).

To contest the speed limit issue, Norton called Terry Olding, the IDOT construction project manager in charge of overseeing the construction project at issue. (Tr. 237-39). Olding testified that he inspected the project on a daily basis and maintained field records of his visits. (Tr. 240). As part of his job, Olding was familiar with the established speed limits and speed reductions in this particular work site area, explaining that the speed limits for the work sites come from the construction plans designed by the engineers. (Tr. 239).

Olding inspected the construction site on the mornings of November 6 and 7, 2014, stating that at that time the project was "winding down." (Tr. 240). He stated that his daily field records include a "speed limit activation summary," and he had reviewed those records prior to the hearing. (Tr. 240). Olding explained that the normal speed limit at the work site location was 70 mph, but when they shut down a lane, the speed limit was typically reduced to 55 mph by turning on the four flashing 55 mph signs in the work zone to protect the workers' safety. (Tr. 240-41, 249). The signs were activated by the construction crew turning on a switch located on each sign. (Tr. 249). Olding maintained a daily record of when the 55 mph flashing signs were turned on and off in the work zone. (Tr. 242).

Olding's records indicated that the 55 mph flashing signs were turned on at 7:00 a.m. on Wednesday, November 5, 2014, and turned off at 5:00 p.m. that same day, and that the signs were not turned on again until Monday, November 10, 2014. (Tr. 243-44). Olding testified that the 55 mph flashing signs would have been turned off on November 6 and 7, 2014, which he verified through his daily work report. (Tr. 244, 250-51, 256). Olding added that as a matter of course, lane closures were not allowed on Fridays due to heavier traffic, and given that

10

November 7, 2014, was a Friday, no lanes would have been closed and the speed limit would have been 70 mph that day. (Tr. 247). He stated that there were approximately 20 construction signs approaching the construction zone and that each sign had an orange flasher on it, and also that the roadside barrels all had flashing lights on them, but that these flashers were for nighttime visibility and did not control the speed limit. (Tr. 249-50).

The Court finds Olding's testimony that the 55 mph signs were not flashing at the time of the stop more credible than Officer Shultz's testimony stating that the 55 mph signs were flashing. Olding visited the work site on a daily basis, maintained written records of when the 55 mph signs were turned on and off, and convincingly explained that no lane closures occurred on Fridays. In light of Olding's detailed testimony, the Court concludes that Officer Shultz mistakenly perceived that the 55 mph signs were turned on due to the flashing markers on the barrels and other constructions signs.

*C. Applicable Law*

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. When police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996).

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810 (citations omitted). Probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense." *United States v.*

11

*Cashman*, 216 F.3d 582, 586 (7th Cir. 2000); *see also United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012). The probable cause standard is an objective one, not a subjective one, and any ulterior motive an officer may have for making the stop is irrelevant. *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (citing *Whren*, 517 U.S. at 813); *United States v. Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003).

Furthermore, probable cause is not necessary for police to conduct a traffic stop for further investigation under *Terry v. Ohio*, 392 U.S. 1 (1968). "To make an investigatory stop, an officer needs only reasonable suspicion supported by articulable facts that criminal activity is afoot." *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002) (citing *Terry*, 392 U.S. at 30; *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000)). Reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Jackson*, 300 F.3d at 745 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

*D. Analysis*

The government argues that Officer Shultz had probable cause to conduct a traffic stop of Norton for two reasons: Officer Shultz had independent probable cause because Norton committed the traffic offense of speeding; and Officer Shultz had reasonable suspicion to stop Norton based on the investigating agents' underlying drug investigation.

    1.    <u>Probable Cause for a Traffic Violation</u>

The Court heard credible testimony from Officer Shultz, who testified that he used his calibrated radar device to detect Norton traveling at 72 mph at the time of the traffic stop. (Tr. 18, 21). Although Officer Shultz was mistaken about the applicable speed limit at the time—it was 70 mph, not 55 mph—his mistake does not invalidate the traffic stop. Norton was traveling

12

72 mph in a 70 mph speed limit, and thus, he was still speeding in violation of Indiana Code § 9-21-5-2(a)(3). *See United States v. Smith*, 80 F.3d 215, 219 (7th Cir. 1996) ("[T]he issue here is not whether [defendant] would have been convicted of a violation in traffic court. The issue is whether there was probable cause that a traffic law had been violated." (citations omitted)); *see e.g.*, *United States v. Moore*, No. 1:07-CR-19-TS, 2008 WL 348770, at *7 (N.D. Ind. Feb. 7, 2008) (finding probable cause for a traffic stop despite the detective's difficulty recalling whether the applicable speed limit was 55 mph or 65 mph, as defendant was traveling 85 mph hour and thus even if the applicable speed limit was 70 mph, he was still speeding).

Norton argues that police officers do not stop motorists for going just two miles over the speed limit, and his traffic stop was a mere pretext for a drug search. But the fact that the officers had an ulterior motive in stopping Norton is irrelevant. *See United States v. Murray*, 89 F.3d 459, 461 (7th Cir. 1996). It is only necessary for the government to show probable cause that Norton was driving in excess of the speed limit, and here it has done so, albeit by just two miles per hour.[3] *See, e.g.*, *United States v. Wilkie*, No. TH04-11-CR-M/L, 2005 WL 613583, at *3 (S.D. Ind. Mar. 7, 2005) (finding reasonable suspicion to effect an investigatory stop of defendant's truck where it was traveling 67 mph in a 65 mph zone and his rear license plate was not illuminated); *United States v. Fuehrer*, No. 15-CR-1016-LRR, 2015 WL 5316970, at *4-5 (N.D. Iowa Sept. 10, 2015) (finding probable cause for the traffic stop, regardless of the officer's

---

[3] Furthermore, although an officer's mistake of law cannot support probable cause to conduct a stop, if an officer makes a stop based on a mistake of *fact*, there is still probable cause for the stop so long as the mistake was reasonable. *See United States v. McDonald*, 453 F.3d 958, 961-62 (7th Cir. 2006). Here, Officer Shultz's mistaken belief that the 55 mph signs were flashing in the construction zone was more akin to a mistake of fact, rather than of a misunderstanding of the law. Considering that it was dark at the time and the barrels had flashing markers for nighttime visibility, his mistaken belief that the 55 mph signs were also flashing appears reasonable. This provides an additional basis to conclude that Officer Shultz had probable cause to stop Norton's vehicle.

ulterior motive for the stop, where defendant was traveling 66 mph in a 65 mph zone).

Additionally, Norton argues that the government failed to produce evidence of Officer Shultz's speed determination of 72 mph, either by way of the actual radar reading, a speeding ticket, or other corroborating evidence. However, the "[u]ncontradicted testimony that [an officer's] radar gun indicated that [defendant] was speeding is normally enough to establish probable cause." *Retzlaff v. City of Cumberland*, No. 09-CV-692-SLC, 2010 WL 1780338, at *6 (W.D. Wis. May 3, 2010) (first two alterations in original; internal quotation marks omitted) (citing *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009)). Here, Officer Shultz's uncontradicted testimony that his radar gun, which he had checked for accuracy at the start of his shift, indicated that Norton was going 72 mph is sufficient to establish probable cause for the stop. The fact that Officer Shultz ultimately wrote a warning, rather than a speeding ticket, is inconsequential in light of the underlying covert drug investigation.

To reiterate, "[a] traffic stop does not violate the Fourth Amendment when the police officer has probable cause to believe that a driver has committed even a minor violation of a traffic law." *United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012). I CONCLUDE that Norton's traveling 72 mph in a 70 mph construction zone provided probable cause for Officer Shultz to conduct a traffic stop of Norton's vehicle.

2. Reasonable Suspicion of Criminal Activity

Moreover, even if Officer Shultz lacked independent probable cause to stop Norton for speeding, Officer Shultz had reasonable suspicion to stop Norton based on the agents' long-term investigation into the drug conspiracy. Although the agents planned to conduct a "walled off" stop of Norton that would rely on the local police officers' independent probable cause,

14

reasonable suspicion existed to conduct a stop of Norton's truck for further investigation based on the agents' surveillance and collective knowledge of conversations between the informant, Bates, Norton, and White.

To support reasonable suspicion, there must be "'specific and articulable facts which, taken together with rational inferences from those facts,' suggest criminal activity." *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (quoting *Terry*, 392 U.S. at 21-22). Reasonable suspicion is "an objective standard, based upon the facts available to the officers at the moment of the seizure." *Id.* (citing *Terry*, 392 U.S. at 21-22); *see United States v. Wimbush*, 337 F.3d 947, 979 (7th Cir. 2003) ("'Reasonable suspicion' must be based on some objective manifestation that the suspect is involved in criminal activity." (citing *Swift*, 220 F.3d at 506)). The standard focuses on "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and the characteristics of the suspect." *Ruiz*, 785 F.3d at 1141 (citation omitted). "When law enforcement officers are in communication regarding a suspect, the knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine." *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000) (collecting cases); *see also United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992); *United States v. Celio*, 945 F.2d 180, 183-84 (7th Cir. 1991). When an informant's information leads to a *Terry* stop, the Court should examine factors such as "the amount of information given, the degree of reliability, and the extent that the officers can corroborate some of the informant's information." *United States v. Booker*, 579 F.3d 835, 838-39 (7th Cir. 2009) (citation omitted).

Here, there was a significant amount of information leading the agents to reasonably

suspect that Norton was engaged in criminal activity. The informant, who had been working with the agents for four months prior to the traffic stop, provided detailed information about Norton's role in Bates's inner circle, and the informant's information was consistently proven credible and reliable through independent police work. FBI surveillance corroborated the informant's visit to Bates's Texas residence, and the informant's report of Bates sending Norton and White to Chicago for heroin was corroborated by a recorded meeting at Norton's house on October 2, 2014. At that meeting, Bates, Norton, White, and others discussed the quality and distribution of the six kilograms of heroin in the house. The informant had also accurately identified Bates's hideout in Ohio, as confirmed by pole camera surveillance.

The informant also accurately predicted Norton's actions in the early morning hours of November 7, 2014. The informant told the agents that $400,000 in drug money that had been repackaged in a very specific way was heading "up north" on the morning of November 7, 2014. The informant correctly described the two trucks that would be seen by surveillance on November 7 at Norton's house, and the informant had previously told the agents that the Bates organization used vehicles with hidden compartments. The informant also accurately described Norton's association with a female in a black Impala. Thus, the informant had a four-month relationship with the agents, he had made substantially incriminating statements about his own involvement in a large drug conspiracy, and this information was corroborated by surveillance, pole camera footage, and the recorded conversation in October. As such, Officer Shultz, through the collective knowledge of the agents, had sufficient specific and articulable facts to provide him reasonable suspicion to stop Norton to investigate his involvement in the drug conspiracy. *See United States v. Navarro*, 90 F.3d 1245, 1253-55 (7th Cir. 1996) (finding probable cause for

a traffic stop and search where the informant's detailed tip was highly reliable in its own right and also verified by police surveillance).

Furthermore, as the traffic stop proceeded, Officer Shultz gathered additional facts that further corroborated the informant's report. Norton was extremely nervous, and his statement that he was going fishing was not consistent with his dress and lack of fishing gear. Officer Shultz smelled burnt marijuana in the truck and saw air fresheners in the truck. Officer Shultz's K9 alerted multiple times to the odor of drugs in the truck. Officer Shultz saw worn screws and an after-market wire indicative of hidden compartments, as well as a spent shell casing consistent with a gun being fired in the truck. In Officer Shultz's experience, these were signs of drug activity. (Tr. 29-31, 34-38, 44, 46). The totality of these circumstances constituted reasonable suspicion to continue the investigative traffic stop of Norton.

Norton's only challenge to the government's reasonable suspicion argument is to merely assert that the government cannot rely on its underlying drug investigation because the agents testified that they planned to conduct a "walled-off" traffic stop. But the fact that the agents *preferred* to make a "walled-off" traffic stop to protect their informant and the long-term drug investigation does not mean that they lacked reasonable suspicion to make the traffic stop based on that drug investigation. (*See* Tr. 158); *see, e.g.*, *United States v. Sellers*, No. 2:08-CR-23, 2008 WL 2116974, at *5-6 (N.D. Ind. May 20, 2008) (finding that although the Drug Enforcement Administration agents made a strategic decision to effect a "walled off" stop of defendant's vehicle to protect the identity of their informant and the integrity of their ongoing investigation, the agents' collective knowledge was imputed to the officer making the stop, and thus, the officer also had reasonable suspicion that defendant was engaged in criminal activity).

17

As stated above, the totality of the circumstances leading up to the time of the traffic stop on November 7, 2014—including the reports of the informant, FBI surveillance, and the agents' experience—created reasonable suspicion that Norton was engaged in criminal activity at the time of the traffic stop. *See United States v. Ienco*, 182 F.3d 517, 524 (7th Cir. 1999) ("[R]easonable suspicion must exist at the time the officer stops an individual; it cannot come after the fact." (citation omitted)).

To reiterate, officers "may conduct an investigatory stop of a person when they have a reasonable, articulable suspicion that criminal activity is afoot." *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014); *see United States v. Guidry*, - - - F.3d - - -, 2016 WL 1118572, at *5 (7th Cir. Mar. 22, 2016) (finding that at the time the officer stopped the defendant's vehicle, he had reasonable suspicion to believe that defendant had drugs in his car). I CONCLUDE that Officer Shultz, based on the collective knowledge of the agents, had reasonable suspicion to believe that Norton was engaged in criminal activity when he stopped Norton's vehicle.

### E.  Conclusion

For the above reasons, I CONCLUDE that Officer Shultz did not violate Norton's Fourth Amendment rights when he conducted the traffic stop. I therefore RECOMMEND that Norton's motion to suppress (DE 75) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for each party. NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings or recommendations. Fed. R. Crim. P. 59(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE

DISTRICT COURT'S ORDER.  Fed. R. Crim. P. 59(b)(2).

   SO ORDERED.

   Entered this 28th day of April 2016.

/s/ Susan Collins  
Susan Collins,  
United States Magistrate Judge