# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:15-CR-2-TLS |
| | ) | |
| LARRY J. NORTON | ) | |

## OPINION AND ORDER

In July 2014, the Federal Bureau of Investigation (FBI) recruited an informant who provided valuable information on the inner circle of a drug operation led by Allan Bates. Through their investigation, the FBI identified the Defendant, Larry Norton, as member of the conspiracy, who was responsible for counting money and distributing cocaine. Investigators believed that, on November 7, 2014, the Defendant would be transporting drug proceeds. They conducted surveillance, initiated a traffic stop, and obtained a search warrant for his vehicle. Their search revealed hidden compartments containing more than $400,000.

A grand jury indicted the Defendant, along with four other defendants, of knowingly and intentionally conspiring to distribute and possess with intent to distribute controlled substances, a violation of 21 U.S.C. § 846. On June 24, 2015, the Defendant filed a Motion to Suppress Evidence [ECF No. 75], seeking suppression of all evidence collected as a result of the traffic stop. Upon referral from this Court, Magistrate Judge Susan L. Collins held evidentiary hearings on October 29 and December 1, 2015, received post-hearing briefing, and issued a Report and Recommendation [ECF No. 135], recommending that the Court deny the Defendant's Motion to Suppress.

This matter is now before the Court on the Defendant's Objections to the Report and Recommendation [ECF No. 137], and the Government's Response [ECF No. 140].

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(A)–(B), a magistrate judge does not have authority to issue a final order on a motion to suppress evidence in a criminal case. Instead, the magistrate judge submits proposed findings of fact and recommendations to the district court. If a party files a timely objection to the magistrate judge's report and recommendation, § 636(b)(1) provides that

> the district judge is to make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The court may accept, reject, modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge also may receive further evidence or recommit the matter to the magistrate judge with instructions.

The Defendant objects to the Magistrate Judge's finding that the testimony supported the conclusion that the Defendant was driving 72 miles per hour. He also objects to the alternative basis for the stop—i.e., that information obtained through a long-term drug investigation provided reasonable suspicion—because the stop was "walled off" from the drug investigation.

De novo review does not require a de novo evidentiary hearing, even when witness credibility is at issue. *See United States v. Raddatz*, 447 U.S. 667, 673–76 (1980). Neither party has requested a hearing, and the Court finds that the record before the Magistrate Judge is sufficient to allow this Court to make a de novo determination.

## ANALYSIS

**A.     Probable Cause That the Defendant Committed a Traffic Violation**

The Supreme Court has held that the decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012) ("A

traffic stop does not violate the Fourth Amendment when the police officer has probable cause to believe that a driver has committed [a traffic violation]."). Probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense." *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000). In other words, the circumstances must be "sufficient to warrant a man or woman of prudence to believe[] that a moving violation has occurred." *United States v. Williams*, 106 F.3d 1362, 1365 (7th Cir. 1997). "A stop and search can be reasonable even if the defendant did not actually commit an offense as long as the officer reasonably believed an offense occurred." *United States v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006).

Officers Brad Shultz, Jeffrey Robertson, Adalberto Martinez, Gary Schenefield, and James Keszie testified at the evidentiary hearing. The Magistrate Judge found that their testimony was not meaningfully contested, except with respect to one point—whether the 55 mph signs in the construction zone were flashing at the time of the traffic stop. On that point, she credited the testimony of Terry Olding, a construction project manager/project engineer with the Indiana Department of Transportation, and concluded that the flashing markers on the barrels and other construction signs caused Officer Shultz to mistakenly perceive that the 55 mph signs were turned on. Therefore, the posted speed limit of 70 mph was the controlling limit. However, the testimony also supported the conclusion that the Defendant was driving faster than the posted limit at 72 mph.

The Defendant objects to the Magistrate Judge's finding that the testimony supported the conclusion that the Defendant was driving 72 mph in a 70 mph zone. The Report contains the following description of the stop:

Special Agent Robertson was part of the surveillance team following Norton. (Tr. 91, 93). He used his vehicle's speedometer to determine Norton's speed by "pacing" him. (Tr. 94–95). Over the course of about 20 minutes on the highway, Special Agent Robertson observed Norton traveling from 70 to 75 mph. (Tr. 94–95). The decision to stop Norton was made when he entered a construction zone near mile marker 333. (Tr. 95). The construction zone was fairly long and marked with barrels with flashing markers, construction equipment, approximately 20 construction signs, and four 55 mph speed limit signs that said "55 when flashing"; both northbound lanes were open. (Tr. 19, 68, 95–96, 100). Due to the early morning hour, it was dark outside and no construction workers were observed. (Tr. 68). Officer Shultz testified that the 55 mph signs were flashing. (Tr. 19). Special Agents Robertson and Keszei testified that they saw flashing lights in the construction zone, but they could not say for sure whether the 55 mph signs were flashing or whether the flashing lights were on the barrels. (Tr. 95, 100–01, 223–24). Officer Shultz and Special Agents Robertson and Keszei all believed that the speed limit in the construction zone was 55 mph at the time. (Tr. 18–19).

Officer Shultz was in radio contact with the undercover agents following Norton. (Tr. 16–17, 231). Officer Shultz was asked to move into position after the agents "had a speeding violation on the vehicle at 72 in a 55 construction zone." (Tr. 18). Special Agent Robertson moved over for the marked police unit driven by Officer Shultz and verified that Officer Shultz was behind the right truck. (Tr. 96–97). Officer Shultz then used his radar and confirmed that Norton was traveling at 72 mph in a 55 mph construction zone at approximately 6:20 a.m. (Tr. 18–19, 21, 24, 79). The radar was hooked into the patrol car's speedometer, so Officer Shultz matched Norton's speed and confirmed the radar's results with his own speedometer, with Norton maintaining a speed of 72 mph for about three to four miles. (Tr. 19–20, 79). Officer Shultz confirmed the reliability and accuracy of his radar on a daily basis at the beginning and end of his shift. (Tr. 19–21).

Officer Shultz initiated a traffic stop, and Norton stopped the truck on the right shoulder of the highway, north of Auburn and just south of the Waterloo exit. (Tr. 19, 23).

(Report and Recommendation 6–7.)

The Defendant asserts that ample evidence contradicts Officer Schultz's testimony regarding the Defendant's speed. First, he maintains that Officer Schultz provided inaccurate testimony when he stated that he "confirmed" that the Defendant's speed was 72 mph because

4

Agent Robertson had only narrowed the Defendant's speed to a range between 70 and 75 mph. The common sense interpretation of the testimony does not reveal any contradictions. During the time that Officer Robertson paced the Defendant, he was able to determine that he drove between 70 and 75 mph. Then, Officer Schultz used his radar to pinpoint the Defendant's speed at 72 mph for three to four miles.

Next, pointing to the agents' testimony that they were looking for any traffic violations, the Defendant argues that if he were actually driving 72 mph for more than twenty miles while being following, they would have stopped him immediately. As the Defendant sees it, because he was not stopped as soon as he violated the speed limit, the accuracy of the testimony about his speed must be questioned. The Defendant's argument fails to recognize a logical, alternative explanation; the agents expected that the traffic stop would be triggered by a violation that was more serious than driving a couple miles over the speed limit. As the Defendant himself argued, police do not typically stop a motorist for going just two miles over the speed limit. The agents reasonably believed that they had witnessed a more significant violation when the Defendant maintained this same speed after entering a construction zone. Thus, it was at that point they decided to initiate the stop.

Finally, the Defendant considers it problematic that Agent Keszei testified to the grand jury that the Defendant's speed was 70 mph at the time of the stop. The grand jury was not tasked with determining whether there was probable cause to believe the Defendant had committed a speeding violation, so referencing the Defendants' speed made no difference to their deliberations. There is no reason to think that Agent Keszei would have been concerned with identifying the Defendant's exact speed, particularly when he believed that the posted limit

5

was 55 mph due to construction.

Finding no error in the Magistrate Judge's findings of fact regarding the circumstances leading up to the traffic stop, the Court ADOPTS those findings of fact. The Court also ADOPTS the Magistrate Judge's conclusion that these facts established probable cause to believe that the Defendant had committed a traffic violation.

**B.   Reasonable Suspicion that the Vehicle Contained Evidence of a Crime**

The Defendant's Objections to the Report and Recommendation also challenges the Magistrate Judge's second rationale for finding that the traffic stop did not violate the Fourth Amendment, which was that the underlying drug investigation provided reasonable suspicion that the vehicle would contain evidence of criminal activity. Essentially, the Defendant argues that because the stop was "walled off" from the drug investigation, it is not permissible to use the evidence gathered during the investigation as a basis for the stop. He presented this argument in the post-hearing briefing to the Magistrate Judge, but she rejected it on grounds that "the fact that the agents *preferred* to make a 'walled off' traffic stop to protect their informant and long standing drug investigation does not mean that they lacked reasonable suspicion to make the traffic stop based on that investigation." (Report and Recommendation 17.) The Defendant objects to this finding. He maintains that, under this logic, a pretextual stop conducted without probable cause can "retroactively be made legal by advancing a theory to which none of the officers involved subscribed at the time of the stop." (Objection 3–4.) This, he argues, is unlawful because "reasonable suspicion must exist at the time the officer stops an individual; it cannot come after the fact." *United States v. Ienco*, 182 F.3d 517, 525 (7th Cir. 1999).

The Court finds no merit to the Defendant's argument that because the investigators wanted to conduct a "walled-off" traffic stop, they were then required to develop independent probable cause to initiate the traffic stop. Just because the officers did not want to rely solely on their drug investigation, does not mean that they were not "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable suspicion is based on the totality of the circumstances "known to the officer" when they make the stop. *United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013). "[S]ubjective motivations for stopping and detaining a suspect are not relevant to the reasonableness inquiry." *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011). When officers are in communication regarding a suspect or are working together at a scene, the knowledge of one officer may be imputed to the other officers under the collective knowledge doctrine. *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000); *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) ("The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action.").

The Defendant's argument was specifically rejected by the Seventh Circuit's decision in *Williams*. In that case, a DEA agent had probable cause to believe that the defendant had just completed a drug transaction. 627 F.3d at 249. He asked local law enforcement officers, who were on standby to assist and positioned in the area, to stop a specific vehicle "after developing their own probable cause to do so." *Id.* Although the district court did not believe that the officer had probable cause to search the vehicle based on a seat belt violation, it nevertheless denied the

7

defendant's motion to suppress on grounds that the DEA investigation and surveillance evidence gave the officer probable cause to search the vehicle under the collective knowledge doctrine. *Id.* at 250–51.

On appeal, the defendant argued that because the officer had been instructed to "develop his own probable cause to stop and search" the vehicle, the officer was "precluded . . . from relying on the DEA's knowledge, and therefore [the officer] could not have been acting in objective reliance on the information he received from [the DEA agent], as is required for the application of the collective knowledge doctrine." *Id.* at 253. The court disagreed with the defendant's characterization of the DEA agent's instruction, as the agent had not "forbid" the officer from relying on the information collected by the DEA task force. "Rather, [the DEA agent] sought to conceal the existence of the DEA investigation and wire taps from [the targets of the investigation]." *Id.* "That effort has no impact on the fact that the DEA agents had probable cause, on which [the officer] was entitled to rely." *Id.* (pointing to decisions from other appeals courts that the application of the collective knowledge doctrine was "unaffected by an officer's use of a cover story to disguise a stop as a mere traffic stop"). It made no difference to the outcome in *Williams* that the officer testified that he did not rely on information from the DEA to justify the search because his "subjective reasons for making the stop and initiating the search [were] irrelevant." *Id.* at 254 (The officer's "motivations for the stop and search do not affect the collective knowledge doctrine analysis.").

Likewise, here, the agents made a strategic decision to attempt a traffic stop that was "walled off" from the investigation so that the long-term drug investigation would not be detected and the agents could continue to investigate the drug conspiracy. (Tr. 157–58, 230,

8

234.) They contacted Office Shultz specifically for the task of making a traffic stop, completing a vehicle search, and recovering illegal items that the agents suspected were inside. Officer Shultz was fully aware of his role and the reason the agents wanted him to target the Defendant's vehicle. Additionally, Officer Shultz had already been involved with the investigation, and knew that it involved drugs, large amounts of cash, and hidden compartments within vehicles for hiding those items. Accordingly, he knew even more about the investigation than did the officer in *Williams*.

The facts set forth in the Report and Recommendation, all of which were known to the Task Force agents before the traffic stop on November 7, 2014, and imputed to Officer Shultz, supported the reasonable belief that the Defendant was engaged in criminal activity, and that his vehicle would contain evidence of that activity. The Court ADOPTS those facts, as well as the conclusion that they created reasonable suspicion that the Defendant was engaged in criminal activity at the time of the traffic stop. Accordingly, the Motion to Suppress is denied.

## CONCLUSION

For the reasons stated above, the Court ADOPTS the Report and Recommendation [ECF No. 135], and DENIES the Motion to Suppress Evidence [ECF No. 75]. A separate scheduling order will be issued.

SO ORDERED on May 26, 2016.

                                                     s/ Theresa L. Springmann
                                                   THERESA L. SPRINGMANN
                                                   UNITED STATES DISTRICT COURT